OPINION
{¶ 1} Appellee-appellant, Ohio Liquor Control Commission ("commission"), appeals from a judgment of the Franklin County Court of Common Pleas reversing orders of the commission that revoked the liquor permit of appellant-appellee, Flamingo Lounge of Ashtabula, Inc. ("Flamingo"). Because the common pleas court abused its discretion in reversing the commission's orders, we reverse.
 {¶ 2} The Ohio Department of Public Safety ("division") initiated 22 cases against Flamingo; the cases were consecutively numbered 542-01 through 563-01. At the hearing before the commission on October 19, 2001, the division dismissed all but eight of the cases; remaining were cases 548-01 through 550-01 and cases 559-01 through 563-01. In exchange for the dismissal, Flamingo in each case entered a denial to the alleged violations, with a stipulation to the investigator's report. By order effective November 20, 2001 at noon, the commission revoked Flamingo's license in each of the eight cases pending before the commission.
 {¶ 3} Flamingo filed a notice of appeal with the common pleas court. Following the parties' full briefing of the issues, the common pleas court reversed the orders of the commission. The commission appeals, assigning the following errors:
 {¶ 4} "I. The lower court incorrectly interpreted Ohio Adm. Code4301:1-1-52(B)(4) by requiring knowledge of the permit holder.
 {¶ 5} "II. The lower court impermissibly substituted its judgment for that of the Ohio Liquor Control Commission.
 {¶ 6} "III. The lower court erred in reversing the orders of the Ohio Liquor Control Commission, as the orders are supported by reliable, probative and substantial evidence and are in accordance with law."
 {¶ 7} Under R.C. 119.12, when a common pleas court reviews an order of an administrative agency, the common pleas court must consider the entire record to determine whether the agency's order is supported by reliable, probative and substantial evidence and is in accordance with law. Univ. of Cincinnati v. Conrad (1980), 63 Ohio St.2d 108, 110-111; see, also, Andrews v. Bd. Of Liquor Control (1955),164 Ohio St. 275, 280.
 {¶ 8} The common pleas court's "review of the administrative record is neither a trial de novo nor an appeal on questions of law only, but a hybrid review in which the court `must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence and the weight thereof.'" Lies v. Veterinary Med. Bd. (1981), 2 Ohio App.3d 204, 207, quoting Andrews at 280. In its review, the common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, but the findings of the agency are not conclusive. Univ. of Cincinnati v. Conrad, supra.
 {¶ 9} An appellate court's review of an administrative decision is more limited than that of a common pleas court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621, rehearing denied, 67 Ohio St.3d 1439. In Pons, the Ohio Supreme Court noted: "* * * While it is incumbent on the trial court to examine the evidence, this is not a function of the appellate court. The appellate court is to determine only if the trial court has abused its discretion[.] * * * Absent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment for [that of an administrative agency] or trial court. Instead, the appellate court must affirm the trial court's judgment." Id. at 621.
 {¶ 10} An appellate court, however, has plenary review of purely legal questions. Steinfels v. Ohio Dept. of Commerce, Div. of Securities (1998), 129 Ohio App.3d 800, 803, appeal not allowed (1999),84 Ohio St.3d 1488; McGee v. Ohio State Bd. of Psychology (1993),82 Ohio App.3d 301, 305, citing Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd. (1992), 63 Ohio St.3d 339, paragraph one of the syllabus, rehearing denied, 63 Ohio St.3d 1459.
 {¶ 11} Because the commission revoked Flamingo's permit in each of the eight cases pending before it, our determination that any one of the cases is supported by the requisite evidence and is in accordance with law requires reversal and results in revocation of Flamingo's license. The commission's third assignment of error, which contends its orders are supported by reliable, probative and substantial evidence and are in accordance with law, potentially renders moot the remaining assignments of error, as well as Flamingo's constitutional argument. Accordingly, we first address the third assignment of error in the context of case 559-01.
 {¶ 12} According to the stipulated facts in case 559-01, Agents Largent and Adkins visited the permit premises at approximately 10:45 p.m. on November 18, 1999, posing as patrons. At approximately 11:45 p.m., Adkins began playing billiards, or pool; because she started the game, she had to "break." On the break, Adkins put the eight ball in the pocket two times in a row. After the second time, Debbie Cartner, a bartender that had greeted Adkins and Largent, told Adkins she should have put a quarter in the can located by the cash register, "because if she had before she would have received all the money that was in the can." (Enforcement Investigative Report, 2.) When Adkins asked Cartner about the can and how to win the money, Cartner informed Adkins that to have a chance at winning the money in the can, a patron had to put a quarter into it before beginning a game of pool. If the patron then put the eight ball in the pocket on the break, the patron received all the money in the can.
 {¶ 13} On the next game of pool, Adkins handed a quarter to Cartner and told her to put it in the can. Adkins started the new game, but because she was unable to put the eight ball in the pocket on the break, she did not win the money. Cartner told Terry Palumbo, the sole owner of Flamingo, about Adkins' prior breaks. Palumbo informed both Largent and Adkins that he once won the money and received over $160.
 {¶ 14} At approximately 2:25 a.m. on November 19, 1999, patrons began exiting the premises. Palumbo suggested Adkins and Largent move to the back of the bar until everyone had left. Ricky Turner, who said he had an interest in Flamingo that was not on paper, told the agents to come with him. Turner led the agents to the back of the bar where they took a seat and waited. At approximately 2:45 a.m., after everyone was out of the bar, Palumbo told Turner to get Adkins and Largent some drinks. Turner poured two Apple Puckers and two Hennessey's; he gave the Apple Puckers to the agents, handed one Hennessey to Palumbo and kept one for himself. Between 2:45 a.m. and 4:00 a.m., Palumbo and Turner provided three drinks each to the agents. Largent went to the restroom where she was able to obtain a sample of the one of the drinks given to her. At 4:00 a.m., the agents left the Flamingo. Analysis of the drink showed it to be a potable alcoholic beverage.
 {¶ 15} The division served notice on Flamingo that an administrative hearing would be held to determine whether its license should be suspended or revoked, or a forfeiture ordered. The notice of hearing alleged that on November 18 and 19, 1999, Flamingo's agent or employee committed two violations on its premises: (1) permitting gaming or wagering on a game and/or scheme of skill and/or chance, namely payoff on a game of chance in violation of Ohio Adm. Code 4301:1-1-53, and (2) giving away in and upon the permit premises intoxicating liquor, namely Apple Puckers, between the hours of 1:00 p.m. [sic] and 5:30 a.m. in violation of Ohio Adm. Code 4301:1-1-49.
 {¶ 16} Ohio Adm. Code 4301:1-1-53(B) ("Rule 53") provides that "[n]o person authorized to sell alcoholic beverages shall have, harbor, keep, exhibit, possess or employ or allow to be kept, exhibited or used in, upon or about the premises of the permit holder any gambling device defined in division (F) of section 2915.01 of the Revised Code which is or has been used for gambling offenses as defined in division (G) of section 2915.01 of the Revised Code." R.C. 2915.01(F) defines a gambling device to include:
 {¶ 17} "(1) A book, totalizer, or other equipment for recording bets;
 {¶ 18} "(2) A ticket, token, or other device representing a chance, share, or interest in a scheme of chance, except a charitable bingo game, or evidencing a bet;
 {¶ 19} "(3) A deck of cards, dice, gaming table, roulette wheel, slot machine, punch board, or other apparatus designed for use in connection with a game of chance;
 {¶ 20} "(4) Any equipment, device, apparatus, or paraphernalia specially designed for gambling purposes."
 {¶ 21} Accordingly, in examining whether Flamingo violated Rule 53, we first must determine whether Flamingo had a gambling device on the permit premises. The stipulated facts do not disclose that any token or ticket was given; no evidence indicates a book or other equipment was used to record bets; and no evidence suggests any equipment specifically was designed for gambling purposes. Although the commission asserts the can into which the quarters were placed at the start of a pool game is equipment specifically designed for gambling purposes, nothing in the investigator's report suggests it was anything but an ordinary can. Accordingly, the only remaining category is R.C. 2915.01(F)(3), which includes a gaming table used in connection with the game of chance.
 {¶ 22} R.C. 2915.01(D) defines a game of chance to mean "poker, craps, roulette, a slot machine, a punch board, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely or wholly by chance." Unlike the games set forth in the definition, billiards is a game largely of skill. State v. Stroupe (1953), 238 N.C. 34, 76 S.E.2d 313. As a result, even if the pool table could be deemed a gaming table, it is not used in connection with a game of chance. Because the division failed to present evidence that Flamingo had a game of chance on the premises, it likewise failed to prove Flamingo had a gambling device that violated Rule 53.
 {¶ 23} The second violation in case 559-01 alleged Flamingo's agent or employee gave away liquor after hours in violation of Ohio Adm. Code 4301:1-1-49 ("Rule 49"), which provides:
 {¶ 24} "No spirituous liquor shall be sold, delivered, or be permitted to be consumed on weekdays on the premises of a D-3 permit holder between the hours of one a.m. and five thirty a.m."
 {¶ 25} The agents here entered the permit premises on Thursday night and stayed until the early hours of Friday. At approximately 2:45 a.m., the owner gave the agents alcoholic beverages. The evidence, thus, demonstrates a violation of Rule 49. We note, however, that the notice of hearing charged the violation occurred with the sale of intoxicating liquor between the hours of 1:00 p.m. [sic] and 5:30 a.m. Even if we ignore the defect in the notice of hearing, only one of the two violations charged in case 559-01 is supported by the evidence. Because the failure to prove one of the two violations calls into question the penalty imposed by the commission, this matter will have to be returned to the commission for further consideration unless the evidence supports one of the other revocations.
 {¶ 26} Each of the other cases involves a violation, at least in part, of Ohio Adm. Code 4301:1-1-52 ("Rule 52"), which provides:
 {¶ 27} "(B) Prohibited activities: no permit holder, his agent, or employee shall knowingly or willfully allow in and upon his licensed permit premises any person to:
 {¶ 28} "* * *
 {¶ 29} "(4) Allow in, upon or about the licensed permit premises, or engage in or facilitate in, the possession, use, manufacture, transfer, or sale of any dangerous drug, controlled substance, narcotic, harmful intoxicant, counterfeit controlled substance, drug, drug paraphernalia, or drug abuse instrument as said terms are defined in ORC Chapter 2925.
 {¶ 30} "* * *
 {¶ 31} "(7) Commit improper conduct of any kind, type, or character that would offend the public's sense of decency, sobriety or good order."
 {¶ 32} In case 548-01, the division served notice on Flamingo that, an administrative hearing would be held to determine whether its license should be suspended or revoked, or a forfeiture ordered. The notice of hearing alleged that, on June 12, 1999, Flamingo's employee or agent committed three violations of Rule 52 when she engaged in improper conduct on the permit premises in knowingly (1) allowing drug abuse, (2) allowing trafficking in drugs, and (3) selling cocaine.
 {¶ 33} The evidence in case 548-01 reflects that Agent Adkins entered the permit premises at about 11:55 p.m. on June 10, 1999, and shortly after that Agent Largent joined her. At approximately 12:15 a.m., on June 11, 1999, Adkins had contact with Michelle Moore, a bartender at the Flamingo, in the restroom area of the premises. Moore asked Adkins if she needed something from her, and Adkins responded that she would like to get a quarter ounce of cocaine. Moore advised Adkins she would make a call and let her know.
 {¶ 34} A short time later, Moore and Adkins walked outside, where Moore told Adkins that the quarter ounce of cocaine would be $450. Adkins agreed, but handed Moore only $400; Adkins explained she would get the other $50 from a friend inside. Moore agreed and told Adkins she would be "sitting by the machine, that Agent Adkins should just walk up and act like she was talking to her and hand the money to her." (Enforcement Investigative Report, 2.) Adkins agreed. Adkins entered the premises, explained the situation to Largent, and requested and received $50 from Largent.
 {¶ 35} Adkins found Moore sitting at the bar next to the pit boss machine and handed Moore the $50. Adkins returned to her seat, but she observed Moore speak to Ricky Turner. Moore advised Adkins that the "dude" said it was too busy, but Adkins could meet Moore at Perkins Restaurant after the bar closed to complete the deal. Adkins agreed. At approximately 3:20 a.m., Moore arrived at Perkins and entered the ladies room as planned. She met with Moore who told her that "[the] dude was out somewhere dropping off some stuff." (Enforcement Investigative Report, 3.)
 {¶ 36} Adkins and Moore agreed that if Moore would get the cocaine for Adkins, Adkins would pick it up from Moore at the Flamingo the next day. Moore assured Adkins that she did not "need to worry about getting ripped off[;] that she would not do that and * * * [Adkins] could ask Terry," a reference to Terry Palumbo. Id. Adkins informed Moore she trusted Moore, as Moore never had wronged Adkins in their past drug deals. Moore explained she would be working Thursday night at seven, and Adkins told Moore she would stop in later.
 {¶ 37} At approximately 9:00 p.m. on June 11, 1999, Adkins entered the Flamingo; she sat at the bar but did not see Moore on the premises. Moore had worked earlier, left, and returned around midnight. Moore approached Adkins, and Adkins asked Moore if Moore had "it," meaning the cocaine; Moore replied affirmatively. At approximately 12:20 a.m., Moore instructed Adkins that when Adkins saw Moore walk to the ladies room, Adkins should come in; that Moore "would wrap the cocaine and leave it behind the small trash can in the stall." (Enforcement Investigative Report, 3-4.) At approximately 12:30 a.m., Adkins watched Moore proceed to the ladies restroom; Adkins followed. Inside the restroom Adkins found Moore in the stall. Moore opened the stall door and said "oh good it's you, it's behind the trash can." (Enforcement Investigative Report, 4.) Adkins entered the stall where, behind the trash can, she found the cocaine in a plastic bag that was wrapped in toilet paper. Adkins thanked Moore and both left the restroom. Adkins tipped Moore for the bar service and advised Moore she would see her after vacation.
 {¶ 38} On the evidence the investigators gathered, the commission found Flamingo had committed all three charged violations. The common pleas court, however, reversed the commission's order and stated, "[t]urning to the issues raised regarding Regulation 52 cited supra, there is no evidence that Appellant [permit holder] `knowingly or willfully allow[ed]' the sale of cocaine on the premises. All the evidence is to the contrary, that Appellant turned to local law enforcement and took steps involving his employees once he knew that drug sales were a possibility in the bar. There is no evidence, substantial or otherwise, that Appellant knowingly or willfully allowed drug sales to go on. The Commission's decision is not supported by evidence as to a knowing violation of this regulation." (Emphasis sic.) (Decision, 4.)
 {¶ 39} Not only the commission's third assignment of error, but also its first assignment of error, is implicated in the common pleas court's reasoning. The commission's first assignment of error asserts the common pleas court erred in finding Rule 52 requires that the permit holder act knowingly, as the rule specifies the rule is violated if the permit holder, its agents or its employees, engages in the prohibited conduct.
 {¶ 40} Contrary to the common pleas court decision, Rule 52 prohibits a permit holder, his agent, or employee from knowingly or willfully engaging in the proscribed activity. Here, although the evidence does not indicate the permit holder knowingly or willfully allowed his employees to engage in the sale of a controlled substance, the evidence demonstrates the permit holder's employee knowingly engaged in a drug transaction. The division need not prove that the permit holder had the requisite knowledge under Rule 52; it needed only to prove that the permit holder or his agent or his employee acted knowingly and willfully. Goldfinger Enterprises, Inc. v. Ohio Liquor Control Comm., Franklin App. No. 01AP-1172, 2002-Ohio-2770, appeal not allowed,96 Ohio St.3d 1533, 2002-Ohio-5351 ("in order to find a violation, it is unnecessary that the permit holder himself or herself participate in or be aware of the prohibited activity. Rather, the clear language of Regulation 52 permits a finding of a violation where only an employee or agent of the permit holder knowingly allows certain activities on the permit premises. Simply put, Regulation 52 does not require knowledge on the part of the permit holder"). The commission's first assignment of error is sustained.
 {¶ 41} Because the evidence indicates the permit holder's employee acted knowingly, the issue resolves to whether the evidence supports a finding of drug abuse, drug trafficking and sale of drugs. While drug abuse and drug trafficking are not defined in Rule 52, the rule references R.C. Chapter 2925, where drug abuse is permitting or allowing a felony drug offense. See R.C. 2925.13. According to the stipulated facts, Moore not only allowed a felony drug offense, but committed one in selling the cocaine to Adkins. Moreover, trafficking in drugs is selling or offering to sell a controlled substance. See R.C. 2925.03. According to the stipulated facts, Moore offered to sell and sold cocaine to Adkins contrary to the specific prohibition of Rule 52(B)(4). Lastly, as noted, the stipulated facts fully support Moore's having sold Adkins cocaine on the permit premises. Indeed, Moore pleaded guilty in federal court to distribution of cocaine. Because the violations alleged in case 548-01 are supported by substantial, reliable and probative evidence in the record, the common pleas court erred in finding otherwise.
 {¶ 42} Moreover, because pursuant to R.C. 4301.25(A) the commission has authority to suspend or revoke a liquor permit for violations of R.C. Chapter 4301 or 4303, or any commission rule, the commission had the authority to suspend or revoke Flamingo's permit. Big Bob's, Inc. v. Ohio Liquor Control Comm., 151 Ohio App.3d 498,2003-Ohio-418.
 {¶ 43} Flamingo contends that, even if the alleged violations are supported by substantial, reliable and probative evidence in the record, the violations the commission found nonetheless are not in accordance with law because Rule 52 is unconstitutionally vague. The notice of hearing did not specify the portion of Rule 52(B) that Flamingo violated. Rule 52(B)(4) specifically prohibits allowing or engaging in the possession, use or sale of drugs on permit premises, and Flamingo's employee Moore clearly violated it. Flamingo nonetheless asserts that because the notice of hearing alleges improper conduct, Flamingo was charged under Rule 52(B)(7) in allowing drug abuse, trafficking in drugs, and the sale of narcotics on the permit premises.
 {¶ 44} Flamingo styles its contention as a facial challenge to the constitutionality of Rule 52(B)(7), but a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc. (1982), 455 U.S. 489, 495,102 S.Ct. 1186. See, also, State v. Ferguson (1991), 57 Ohio St.3d 176. Here, even if the term "improper conduct" is vague in some applications, see 161 Dublin, Inc. v. Liquor Control Comm., Franklin App. No. 01AP-134, 2001-Ohio-8863, appeal not allowed, 95 Ohio St.3d 1438, 2002-Ohio-2084, the conduct in which Flamingo's employee engaged is a clear violation of not only Rule 52(B)(4), but also at least three felony drug statutes. Because Flamingo's conduct is so clearly proscribed, Flamingo arguably has no standing to complain about the vagueness of the law as applied to others. State ex rel. Miller v. Nu-Look Bookstore (Apr. 30, 1991), Franklin App. No. 90AP-939, citing Village of Hoffman Estates, supra.
 {¶ 45} In the final analysis, however, we need not determine the constitutional issue Flamingo raises. The commission's notice of hearing implicated both Rule 52(B)(4) and 52(B)(7) by advising Flamingo its permit was subject to sanction due to improper conduct in the form of drug activity. We decline Flamingo's invitation to channel the commission's allegations into Rule 52(B)(7), when the alleged activity as easily falls under the parameters of Rule 52(B)(4). See Sermon v. Ohio Liquor Control Comm. (July 20, 1995), Franklin App. No. 95APE01-18 (noting that because the permit holder had actual knowledge of the nature of the violations charged, any error in the notice of hearing was harmless).
 {¶ 46} Because the requisite evidence support the commission's order, Henry's Café v. Bd. of Liquor Control (1959),170 Ohio St. 233 prevents our altering the sanction, stating that "[o]n such appeal the Court of Common Pleas has no authority to modify a penalty that the agency was authorized to and did impose, on the ground that the agency abused its discretion." Id., paragraph three of the syllabus. Having accepted Flamingo's stipulation and found on sufficient evidence that Flamingo's employee violated the statute, the commission was authorized by law to suspend or revoke Flamingo's permit. Under those circumstances, neither the common pleas court nor this court is empowered to modify that sanction. See Aida Enterprises, Inc. v. Ohio State Liquor Control Comm., Franklin App. No. 01AP-1178, 2002-Ohio-2764, appeal not allowed, 96 Ohio St.3d 1533, 2002-Ohio-5351; Goldfinger Enterprises; Lindner v. Ohio Liquor Control Comm. (May 31, 2001), Franklin App. No. 00AP-1430. Accordingly, the commission's third assignment of error is sustained.
 {¶ 47} Having sustained the commission's first and third assignments of error, rendering moot its second assignment of error, we reverse the judgment of the common pleas court and remand with instructions to enter judgment affirming the order of the commission in case 548-01.
Judgment reversed and case remanded with instructions.
PETREE, P.J., concurs.
TYACK, J., concurs separately.